## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

---

CHRISTINA SMITH, individually and as next
friend of her son, Joshua England,

                    Plaintiff,

          – against –

JOE ALLBAUGH, CARL BEAR, ROBERT
BALOGH, WENDELL MILES, LAURA HAYS,
LAURA NOBLE, OKLAHOMA DEPARTMENT
OF CORRECTIONS OFFICERS JOHN DOES #1-
10, and CASE MANAGER RICHARD ROE;

                    Defendants.

---

**Case No. 19-cv-00470-G**

**FIRST AMENDED COMPLAINT
AND JURY DEMAND**

---

## PRELIMINARY STATEMENT

1.      Plaintiff Christina Smith brings this civil rights action, individually and as next friend of her son, Joshua England. Joshua died on May 29, 2018 while incarcerated at Joseph Harp Correctional Center in Lexington. He was 21 years old. Joshua's tragic and utterly unnecessary death was caused by the callous and deliberate indifference to his serious medical condition shown by medical providers and correction officers at Joseph Harp.

2.      Joshua was serving a short prison sentence—his first and only prison sentence—when he began to experience the classic signs of appendicitis, including intense stomach pain. On at least five separate occasions over the course of seven days, Joshua sought medical treatment from prison staff at Joseph Harp. On each occasion, Joshua complained of severe abdominal pain and presented with classic symptoms of acute appendicitis. He begged for help. Prison staff refused to provide even the most basic medical treatment for Joshua. Prison staff failed to give Joshua a proper clinical abdominal examination and, when his condition dramatically worsened, failed to send him to a nearby medical facility for a CAT scan or surgical

evaluation, as required by commonly accepted medical procedure. Instead, corrections officers and medical staff belittled Joshua, and did nothing as Joshua, suffering extreme pain, rapidly deteriorated. As a result of Defendants' callously indifferent treatment, Joshua died alone in his prison cell with a ruptured appendix, after suffering the excruciating agony of acute peritonitis. Defendants then falsified medical records to attempt to cover up their shocking misconduct.

3.      Joshua was scheduled to be released from prison in September 2018, less than three months after he died. Joshua's untimely and excruciating death was entirely preventable, if only he had been provided with minimally adequate medical care. Defendants' actions were contrary to law, contrary to sound medical practice, and contrary to the norms of a civilized society. This complaint, arising from these tragic, outrageous, and unlawful acts, seeks compensatory and punitive damages, costs, disbursements, and attorneys' fees pursuant to applicable state and federal law.

## **PARTIES**

4.      Joshua England was a citizen of the United States and resided at the Joseph Harp Correctional Center, Cleveland County, at the time these events occurred. He was also a member of the Choctaw Nation.

5.      Christina Smith is Joshua's mother. She is a citizen of the United States and a resident of Oklahoma.

6.      At all times relevant hereto, Defendant Joe Allbaugh was the Director of the Oklahoma Department of Corrections ("DOC"), acting under color of state law. On information and belief, Allbaugh, as Director of the DOC, was responsible for the supervision and conduct of all DOC matters, and was responsible for the training, supervision, and conduct of all DOC personnel, including the Defendants referenced herein. As Director, Allbaugh was also responsible for the care, custody, and control of all inmates housed in the DOC's prisons,

including the creation, promulgation, implementation, and oversight of policies and programs governing on-site medical treatment programs for inmates of prison facilities, including Joseph Harp. In addition, at all relevant times, Allbaugh was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obeyed the laws of the United States and of the State of Oklahoma.

7.     At all times relevant hereto, Defendant Carl Bear was the Warden of the Joseph Harp within the DOC, acting under color of state law. As Warden, his responsibilities included the care, custody, and control of all inmates, as well as the supervision of all staff. He was responsible for the creation, promulgation, implementation, and oversight of policies and programs governing on-site medical treatment of inmates at Joseph Harp. As Warden, Bear had a duty to ensure the physical safety and wellbeing of the people incarcerated at Joseph Harp and to provide them with fundamental human necessities, including medical care.

8.     Defendants Allbaugh and Bear (collectively "the Senior Defendants") were, at all times relevant hereto, senior officials who exercised policymaking, supervisory, and disciplinary authority on behalf of the DOC. The Senior Defendants are sued in their individual capacities.

9.     On information and belief, at all times relevant hereto, Defendant Robert Balogh was a physician employed by the DOC and assigned to Joseph Harp, where he was responsible for the provision of appropriate medical care to patients, including Joshua.

10.     On information and belief, at all times relevant hereto, Defendant Wendell Miles was a physician's assistant employed by the DOC and assigned to Joseph Harp, where he was responsible for the provision of appropriate medical care to patients, including Joshua.

11.     On information and belief, at all times relevant hereto, Defendant Laura Hays was a licensed practical nurse employed by the DOC and assigned to Joseph Harp, where she was responsible for the provision of appropriate medical care to patients, including Joshua.

12.     On information and belief, at all times relevant hereto, Defendant Laura Noble was a licensed practical nurse employed by the DOC and assigned to Joseph Harp, where she was responsible for the provision of appropriate medical care to patients, including Joshua.

13.     On information and belief, at all times relevant hereto, Defendants Balogh, Miles, Hays, and Noble ("the Medical Defendants") were physicians, physician's assistants, and/or nurses employed by the DOC who participated in and/or had knowledge of and failed to intervene in the denial of adequate medical care to Joshua. Their duties to provide medical care to inmates at Joseph Harp included but were not limited to caring for all patients in their assigned areas at Joseph Harp, which included but was not limited to cell visits, physical examinations, identification of acute conditions, design and implementation of appropriate plans to facilitate care, provision of medications, coordination of treatment with other providers, direct oversight and supervision of nursing staff, and/or provision of emergency medical care. At all relevant times hereto, the Medical Defendants were acting under color of state law. Their responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of Oklahoma prisons, including DOC policies, procedures, directives, and protocols, in addition to all relevant local, state, and federal statutes and regulations. The Medical Defendants are sued in their individual capacities.

14.     On information and belief, at all times relevant hereto, Officers John Doe #1-10 ("Officer Defendants") were DOC officers working at Joseph Harp, who participated in and/or had knowledge of and failed to intervene in the denial of adequate medical treatment to

Joshua. At all times relevant hereto, the Officer Defendants were acting under color of state law. The Officer Defendants are sued under fictious designations because Plaintiff has been unable to ascertain their names and shield numbers, despite reasonable efforts to do so. The Officer Defendants are sued in their individual capacities.

15.     On information and belief, at all times relevant hereto, Defendant Richard Roe worked for DOC as a case manager at Joseph Harp. He participated in and/or had knowledge of and failed to intervene in the denial of adequate medical treatment of Joshua. At all times relevant hereto, Defendant Roe was acting under color of state law. Defendant Roe is sued under a fictious designation because Plaintiff has been unable to ascertain his name and shield number, despite reasonable efforts to do so. Defendant Roe is sued in his individual capacity.

## JURISDICTION AND VENUE

16.     This action arises under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and Oklahoma state common law.

17.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a), and the laws of the State of Oklahoma.

18.     The acts complained of occurred in the Western District of Oklahoma, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## JURY DEMAND

19.     Plaintiff demands trial by jury in this action.

## STATEMENT OF FACTS

20.     Joshua England was born on May 14, 1997. He grew up in northwest Oklahoma. His childhood was sometimes difficult, as he moved between his mother's home, his cousin's home, his girlfriend's parents' home, and foster homes.

21.     By his late teens, Joshua had begun to turn his life around. He wanted to finish high school. He dreamed of starting a family. His Christian faith was important to him, and he found solace in his church community.

22.     Joshua worked with the cattle at the local sale barn. He loved animals, especially horses, and hoped to operate his own ranch one day on a small piece of land he was set to inherit from his grandfather. He loved fishing and had told his former girlfriend that he wanted to take her fishing as soon as he was released from prison.

23.     In June 2017, just after his 20th birthday, Joshua was arrested and charged with fourth degree arson and other related charges. He was sentenced to serve 343 days in prison. He had never before served time in prison.

24.     On October 6, 2017, Joshua was admitted to DOC custody at the Lexington Assessment and Reception Center ("LARC"). He was later transferred to the Bill Johnson Correctional Center, and then to Joseph Harp.

25.     Joseph Harp is located in Lexington, Oklahoma, less than two miles from LARC. On information and belief, there is an infirmary at LARC that can provide a higher level of care than is available at Joseph Harp.

26.     When Joshua arrived at Joseph Harp on or about February 22, 2018, he underwent a physical examination and medical evaluation. The intake screening showed that Joshua was in generally good health.

27.     Joshua slowly adjusted to life at Joseph Harp. He participated in a weekly Saturday night Bible study group.

***Joshua's First Complaint to Medical Staff of Severe Stomach Pain***

28.     On May 22, 2018, Joshua submitted a sick call request to be seen by the prison health clinic staff, complaining of severe abdominal pain. He reported that he had been

vomiting all night and reporting that he appeared to be vomiting blood. "[M]y stomach hurts so so

bad," he wrote on the form requesting health services, depicted below:



Figure 1: Request for Health Services (5/22/18)

29.    Defendant Hays, an LPN, saw Joshua in the clinic that morning. Joshua

described his pain as a level 8. According to the clinic's records, Joshua had lost nearly six

pounds in six days.

30.    Although Defendant Hays noted that Joshua was holding his abdomen and

"guarding" it throughout the appointment—textbook signs of appendicitis—she did not conduct a

complete abdominal exam.

31.    Defendant Hays gave Joshua Pepto-Bismol, sent him away, and told him to

come back if his pain did not improve in three days. No doctor was called. No surgeon was called.

32.     Joshua's pain worsened.

33.     Around this time, other prisoners at Joseph Harp noticed that Joshua had

lost a dramatic amount of weight and described that his eyes were sinking into his face.

***Joshua's Second Complaint to Medical Staff of Severe Stomach Pain***

34.     The next day, May 23, 2018, Joshua submitted another sick call request,

complaining that the pain in his stomach was so bad that he could "barely breath."

35.     In his form requesting health services, depicted below, Joshua wrote that he

could not sleep or eat anything.



Figure 2: Request for Health Services (5/23/18)

36.     Joshua was seen in the clinic in the afternoon, where he was treated by Defendants Hays and Miles. Joshua described his pain as a level 10. His pulse was racing, at 102 beats per minute—dramatically higher than normal ranges for men his age, and far above the 61 beats per minute he had recorded at the clinic just the day before. He reported that there was blood in his stool. Again, no Medical Defendant conducted a complete abdominal exam on him.

37.     Despite Joshua's alarming and deteriorating condition, Defendants took no meaningful action to help him. Joshua was given magnesium citrate, a laxative, and was sent back to his cell.

38.     Joshua's rapid heart rate and elevated blood pressure, combined with his complaints of severe pain and report of rectal bleeding, should have alerted the medical staff and the Medical Defendants that he needed to be seen immediately by a physician. However, once again, Joshua was not seen by a physician and was not given a complete abdominal exam.

***Joshua's Third Complaint to Medical Staff of Severe Stomach Pain***

39.     Joshua was still in excruciating pain. During this time, Joshua was sleeping on a mattress on the floor of his cell because he lacked the strength to climb his top bunk. As observed by inmates and prison staff, Joshua was openly and obviously extremely ill.

40.     Joshua submitted another sick call request that same day for medical treatment: "my stomach hurts so bad. . . . it's hard to breathe and sleep . . .", as shown below.

Figure 3: Request for Health Services (5/23/18)

41.     In response to Joshua's third request for medical help, on May 24, 2018,
Defendant Hays wrote: "You were seen on 5/23/18," and refused to see him.

42.     On information and belief, Joshua appeared at the medical clinic between
May 22 and May 29 in tears on at least one occasion.

43.     Joshua reported to other prisoners that medical staff at the clinic were
making fun of him and did not take his complaints seriously.

### Joshua's Fourth Complaint to Medical Staff of Severe Stomach Pain

44.     Three days later, on May 26, 2019, Joshua again requested medical help,
writing on the sick call slip that his "stomach hurts so so bad its [*sic*] hard to breath [*sic*]." He also
complained that he could not lie down, as shown below.

Figure 4: Request for Health Services (5/26/18)

45.     That morning, Defendants Noble and Miles saw Joshua in the clinic. He again complained of severe pain, rating it a level 9 out of 10, and had an elevated pulse. Defendants wrote in his medical chart that Joshua's symptoms began two days ago, although in fact Joshua had been coming to the clinic complaining of severe abdominal pain starting four days earlier.

46.     Even after Joshua had been complaining about pain for at least four days, the Medical Defendants still failed to perform a complete abdominal exam.

47.     On May 26, 2019, Defendant Balogh was notified of Joshua's condition, apparently by phone. Defendant Balogh did not visit Joshua in person or examine him. Instead, he ordered that Joshua be given Ibuprofen and be told to drink plenty of fluids and eat fibrous foods.

48.     After days of complaining about severe pain and presenting with alarming vital signs, this was the first time that medical staff consulted a doctor about Joshua. Still, neither Defendant Balgoh nor any other physician ever personally examined Joshua or provided adequate treatment.

49.     Joshua continued to suffer. He was unable to go to his prison job or even to the cafeteria to eat. He was not showering. He remained in his cell, often lying on the floor and crying in agony.

50.     Multiple witnesses who saw Joshua in the days leading to his death observed that he was not eating or drinking, he had lost significant weight, his skin color had changed, he reported stabbing pain to his right side (including by pointing and holding his abdomen), and he seemed different mentally: slow, not "with it," and not in his "right mind."

51.     On information and belief, Officers Doe #1-10 saw Joshua suffering in pain and lying on the floor of his cell but did nothing to intervene and ensure he received medical care.

***Joshua's Fifth Complaint to Medical Staff of Severe Stomach Pain***

52.     On the morning of May 29, 2018, Joshua submitted **a fifth** sick call request, and begged medical staff at Joseph Harp for help, telling them that he was "short of breath" and that his "stomach hurts," as depicted below:

Figure 5: Request for Health Services (5/29/18)

53.     On the morning of May 29, 2018, Joshua again visited the clinic. His

medical record reflects that his chief complaint was "Can't breathe."

54.     He had lost twelve pounds in less than two weeks.

55.     Witnesses who saw Joshua that day near the clinic report that he was

hyper-ventilating, doubled-over because of pain (or curled in fetal position), rocking back and

forth, and crying.

56.     Defendant Hays later noted in Joshua's chart that he appeared "distraught,"

he was "sweating profusely," and his heart rate and respiratory rate were not within normal limits.

57.     While he was the clinic, medical staff took an EKG of Joshua's heart. It

showed that his heart rate was at a shocking 158 beats per minute.

58.     The EKG results should have alerted clinic staff that Joshua was facing a dire medical emergency and that he needed life-saving intervention at a hospital immediately. Instead, Defendants continued to ignore Joshua and his complaints, and failed to render an abdominal examination.

59.     Rather than being rushed to an outside hospital in light of the clear medical emergency, Joshua was instructed to sit and wait at the clinic longer to see the provider.

60.     Unable to bear the pain, Joshua returned to his cell rather than wait any longer.

61.     Back at his cell, Joshua was saying things that didn't make sense, making sounds, and appeared to be imagining things.

62.     According to Joshua's medical records, Defendants Hays notified only Defendant Miles of Joshua's visit to the clinic, and not a physician.

63.     If a physician adhering to reasonable standards of care had seen the EKG results on the morning of May 29, 2018, the physician would have immediately recognized Joshua's dire condition. The physician would have begun standard emergency appendicitis protocols to get Joshua to a hospital—and into surgery—immediately.

64.     Upon information and belief, DOC policy in effect at this time advised facility nurses or staff to immediately inform the facility medical provider when confronted with, among other symptoms, complaints of difficulty breathing or any complaint relating to the abdomen. Despite this policy, Defendants Hays and Defendant Miles failed to immediately notify the facility physician when Joshua told them he couldn't breath and that he was experiencing serious pain in his stomach.

65.     Upon information and belief, the DOC policy in effect at the time also required facility nurses and staff to immediately contact emergency services if an inmate complained of severe difficulty breathing or was experiencing a sudden onset of altered medical status. Under this policy, Defendants Hays and Miles should have contacted emergency services to help Joshua.

66.     To the extent these policies existed, they were not followed in Joshua's case, leading to his death.

67.     Upon information and belief, the Senior Defendants failed to promulgate, implement, and/or enforce policies or procedures requiring medical staff, including Defendants Hays and Miles, to immediately inform a physician and/or refer an inmate to a hospital when an inmate presented complaints about difficulty breathing or acute stomach pain, and/or showed obvious signs of medical distress, like a racing heart rate and other symptoms that are commonly associated with acute appendicitis, or that would require physicians including Defendant Balogh, to conduct an in-person examination of a critically ill patient or arrange for their immediate transfer to a facility where such a physician's examination was available.

68.     Despite the critical nature of Joshua's symptoms, including his massively elevated heart rate and rapid and shallow breathing notable enough to include in his medical chart, Defendants did nothing to provide emergency medical treatment to Joshua on May 29.

69.     On information and belief, after Joshua left the clinic unable to wait to be treated, Defendant Hays and other Joseph Harp employees, including Case Manager Richard Roe and Officer John Doe #10, went to Joshua's cell. Several inmates witnessed DOC staff taking a video camera to Joshua's cell, apparently to video record Joshua in his final, dying moments.

70.     On information and belief, Joshua told Defendants that he could not walk back to the clinic.

71.     On information and belief, instead of bringing a stretcher or a wheelchair to transport Joshua back to the clinic or hospital, or calling for an ambulance, Defendants recorded a video of Joshua as he lay dying in his cell, ostensibly to document his "refusal" of medical care. Defendants have refused to release a copy of the video to Joshua's family.

72.     At this point, Joshua was in obvious extreme distress and obviously delirious from pain and probable shock. Any reasonable lay person would have recognized that Joshua was, at this point, incapable of rational thought and decision-making.

73.     Defendant Hays wrote in the medical chart that Joshua "waived sick call appointment."

74.     Defendant Hays filled out a "Waiver of Treatment/Evaluation," which she forced Joshua to sign despite his clear extreme distress and delirious state, as even evidenced by his shaky signature, and despite Defendant Hays' own statement, on the waiver form, that Joshua faced "**possible death**," as depicted below:

Figure 6: Waiver of Treatment/Evaluation (5/29/18)

75.     Defendants' conduct was a complete deviation from reasonable standards of medical care. A reasonable medical provider would have readily recognized that Joshua was not competent to refuse medical treatment. He could not make an informed and voluntary choice regarding his medical treatment: he was too sick, and hours from death.

76.     Indeed, a reasonable medical provider would know that Joshua was *not* refusing treatment but rather demonstrating that he was too sick to walk on his own—and that emergency services were needed immediately. This is precisely the situation in which a wheelchair or stretcher is required to transport a patient.

77.     Upon information and belief, the Senior Defendants failed to promulgate, implement, and/or enforce policies and procedures regarding informed and voluntary choices by inmates seeking medical care, or the conditions under which an inmate lacks capacity to "refuse"

medical treatment, or which forbid staff to attempt to secure an inmate's waiver of treatment when the inmate was not capable of intelligently, knowingly, and voluntarily waiving treatment in an emergency situation, as was the case with Joshua.

78.     Despite Defendants' own recognition that Joshua would likely die without immediate emergency care, Defendants knowingly and intentionally left Joshua in his cell to die, attempting to justify their conduct by coercing Joshua to sign a release form when he was plainly extremely ill, very close to death, and incapable of rational thought or decision-making.

79.     Despite his obvious distress, delirium and deteriorating health, Defendants failed to transport Joshua to the clinic via ambulance or stretcher, call an ambulance, or take any other steps to protect his health and safety.

80.     Just hours later, at 4:43pm, after languishing in delirium and unimaginable pain, Joshua died alone on the floor of his prison cell. He had turned 21 years old two weeks earlier.

81.     An autopsy performed by the Office of the Chief Medical Examiner later determined that Joshua had died of a ruptured appendix with acute peritonitis, a condition that is survivable with appropriate, standard medical treatment.

82.     If Defendants had provided Joshua with appropriate medical care, he would not have died of a ruptured appendix on May 29, 2018.

***Defendants Attempt to Cover Up Their Egregious Failures to Care for Joshua***

83.     Recognizing that Joshua's death was preventable and that it revealed their shockingly deficient care of him, Defendants sought to cover up their misconduct.

84.     At 8:08 pm, four hours after Joshua was found dead his cell, Defendant Hays wrote a note in Joshua's chart purporting to document Joshua's early morning clinic visit on

May 29, 2018. Providing far more detail than any of Joshua's prior clinic notes, Defendant Hays

wrote that Joshua's vital signs had been "within normal limits except HR and Resp," though she

did not record the specific rates. This was an absurd and obviously false note given that Joshua's

critical vital signs were far outside normal limits: His heart rate was 158 beats per minute.

85.     Defendant Hays further stated that Joshua was in "no distress" and "little to

no distress" when she left him in his cell on the morning of May 28, 2019—an implausible and

obviously false claim, given his complaints of pain and his death only hours later of acute

peritonitis. Defendant Hays' falsified note lists the time of service provided to Joshua as 8:08pm,

but of course, he had been dead for hours by that point.

86.     The Officer and Medical Defendants, who were responsible for Joshua's

care, utterly disregarded Joshua's serious medical condition and deliberately ignored Joshua's

need for medical treatment.

87.     Joshua experienced extreme pain and suffering, emotional distress, and

death as a result of Defendants' misconduct, including but not limited to their cruel and unusual

treatment of Joshua, their deliberate indifference to his medical needs, and their medical

malpractice.

88.     Joshua's mother, Plaintiff Christina Smith, suffered extensive emotional

distress and grief at the sudden and preventable death of her son.

89.     Had Joshua received adequate and appropriate medical care and

supervision and intervention when he became ill, his death would have been prevented.

***Joshua's Death Evidences a Culture of Disregard for Prisoners' Health at Joseph Harp***

90.      Joshua's death resulted from a culture of unconstitutional disregard for the

inmates in DOC's care: Joshua's deteriorating health and mental status were observed over the

19

course of this six day period by many DOC officers, supervisors, and administrators, together with clinicians employed by DOC, all of whom showed deliberate indifference to Joshua's serious medical needs by failing to provide the very basics of medical care and failing to take appropriate action in a timely manner to a medical emergency which resulted in Joshua's death.

91.     For years, Oklahoma prisons have been saddled with incompetent and inadequate medical services. A 2012 report by *The Oklahoman* found that over a third of all doctors employed by DOC had been sanctioned during their medical careers, often for abusing drugs and writing fraudulent prescriptions.

92.     Included in that number are two of the medical providers responsible for Joshua's care in the days leading to his death: Defendants Miles and Balogh.

93.     In 2010, Defendant Balogh was disciplined by the Oklahoma Bureau of Narcotics and Dangerous Drugs ("BNDD") after admitting that he was addicted to pain medication and that he used cocaine recreationally. He also admitted to "diverting drugs of patients by requiring patients to bring all medications to an appointment, and then taking 'handfuls' of the drugs for himself," according to the BNDD Order.

94.     Defendant Balogh was fined $10,000 by the BNDD and placed under a 5-year probation—but kept his medical license and ultimately secured a job as the responsible physician for inmates at Joseph Harp—where he failed to provide minimally adequate medical care to Joshua when he presented with the classic symptoms of appendicitis.

95.     According to *The Oklahoman*'s report, Defendant Miles, whom had his physician's assistant license revoked in the 1980s for writing fake prescriptions for himself, and was disciplined again in 1996 for substance abuse problems, after which he was placed on probation. Still, he found a job at DOC—where he ignored Joshua's complaints for a week before

Joshua died of a preventable illness.

96.     The Senior Defendants endangered Joshua by improperly hiring, supervising, and retaining Defendants Balogh and Miles on staff.

97.     The Senior Defendants were responsible for creating, promulgating, implementing and/or enforcing the policies, practices, and procedures at Joseph Harp, including those that dictated when an inmate must be seen and examined by a physician, when an inmate must be taken to an outside medical facility or hospital, and how and under what circumstances an inmate may "refuse" medical treatment. The Senior Defendants' failure to adopt or enforce such policies led to the conscious-shocking medical failures that caused Joshua's death, and to the conscious-shocking manner in which the prison's staff attempted to obtain and document Joshua's so-called waiver of medical treatment, which was, in fact, a fraud.

98.     The Senior Defendants were aware of the grossly deficient medical care provided to inmates at Joseph Harp but took no steps to correct it or to hire appropriate medical providers. They were aware that the policies and procedures they created, promulgated, implemented, and/or enforce—or failed to create, promulgate, implement, or enforce—resulted in grossly deficient medical care to inmates at Joseph Harp. In creating, promulgating, implementing, and/or enforcing these policies and practices, or failing to do so, they acted with deliberate indifference to the medical needs of the Joseph Harp inmates, including Joshua.

99.     Upon information and belief, Joseph Harp was overcrowded, underfunded, and understaffed during the relevant time period, which contributed to the failure to provide adequate medical care to prisoners, including Joshua.

100.    Defendant Allbaugh was aware of these serious problems jeopardizing the health and safety of those confined inside Joseph Harp. For example, in 2017, he declared that the

Department of Corrections was in a state of deterioration and crisis: "'We are not a listing ship,' Corrections Director Joe Allbaugh said recently in his Oklahoma City office. 'We are a sinking ship.'" Ben Botkin, *Oklahoma Watch: Weighing the odds of a federal takeover of state prisons*, Tulsa World, Dec. 25, 2017.[1] In that same article, Allbaugh warned, "'if the state doesn't demonstrate that they can handle their prison population in a safe and humane way, what are inmates supposed to do? They're going to sue.'" *Id*.

101.    The woeful inadequacy of the state prison system's ability to care for its inmates, including those at Joseph Harp, was known to the Senior Defendants during the relevant time period, but they took no steps to protect Joshua.

***Joshua's Painful, Tragic Death Was Preventable and Unnecessary***

102.    Acute appendicitis is easily treatable. Joshua England should not have died from the condition. Before his death, Joshua made five written requests for medical care all of which signaled clear signs of appendicitis. Defendants failed each time to render any meaningful care. If Defendants had provided proper treatment, care, and monitoring at any point after Joshua made his first request for treatment, Joshua would not have died.

103.    One in 10 people will suffer from appendicitis in their lifetime. Most often, appendicitis presents in patients between the ages of 10 and 30, with a "predominance among patients presenting before age 30, with a male-to-female ratio of approximately 3:2."[2]

104.    Appendicitis occurs when the lining of the appendix becomes inflamed or infected, either caused by a back-up of stool and or a swelling of lymph tissue, and as a result the

---

[1] Available at https://www.tulsaworld.com/news/state/oklahoma-watch-weighing-the-odds-of-a-federal-takeover-of/article_6664b0b4-769b-5fa8-a0c5-fe63f83f8635.html.
[2] Ronald F Martin, *Acute Appendicitis in Adults: Clinical Manifestations and Differential Diagnosis,* Uptodate.com, https://www.uptodate.com/contents/acute-appendicitis-in-adults-clinical-manifestations-and-differential-diagnosis.

bacteria there becomes stuck and multiplies. This causes excruciating pain and ultimately leads to a rupture, if left untreated.[3]

105.    The initial signs of appendicitis are clear: Patients begin to feel sharp pain in and around the bellybutton as well as in the lower right quadrant of their abdomen.[4]

106.    As inflammation worsens, the patient, begins to experience severe discomfort. The blockage of bacteria and the subsequent infection leads to nausea and vomiting, severe loss of appetite, fever, abdominal bloating, and pain that is exacerbated by walking, coughing, or making the slightest of movements.[5]

107.    Joshua repeatedly complained of these exact symptoms.

108.    Because untreated appendicitis can be fatal, the American Medical Association ("AMA") advises that patients presenting with complaints of sharp abdominal pain be given an *immediate* physical exam, including but not limited to a rectal digital exam. If the results of that exam are unclear, the AMA advises physicians to order an imaging scan.

109.    Regular clinical methods of examination can obtain the correct diagnosis for appendicitis in between 71% and 97% of cases. The only laboratory test that is *needed* for initial evaluation is a complete blood count to determine if there is a significantly elevated white blood cell count signaling an infection or inflammation.[6]

110.    In an article on treating appendicitis in resource-limited settings, the physician author writes: "If there is any question about the diagnosis, more physical examinations

---

[3] *See* Appendicitis, Mayo Clinic (2018), https://www.mayoclinic.org/diseases-conditions/appendicitis/symptoms-causes/syc-20369543 (last visited Mar 14, 2019).
[4] *Id.*
[5] *See* Martin, Acute Appendicitis in Adults, *supra.*
[6] *See* Alfredo Alvarado, *How to improve the clinical diagnosis of acute appendicitis in resource limited settings*, 11 World Journal of Emergency Surgery (2016).

and laboratory tests should be performed and the patient should be evaluated every four to six

hours, preference in the hospital."[7]

111.    Appendicitis treatment usually involves surgery to remove the inflamed

appendix. Though some studies have shown a positive reaction to antibiotics, the most effective

and long-lasting results, especially for men, have occurred after successful and routine

appendectomy.

112.    If Defendants had adhered to minimal, common standards of medical care

and treatment, they would have diagnosed Joshua's appendicitis and saved his life.

*Plaintiff's Notice of Claim*

113.    On August 17, Joshua's mother, his next of kin, filed a claim for

compensation with the Oklahoma Office of Management and Enterprise Services ("OMES").

OMES confirmed receipt on August 22, 2018. On January 24, 2019, OMES denied the claim.

114.    Plaintiff filed a complaint within one year and ninety days of the start of

Joshua's mistreatment and two years after Joshua's death.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### (Against All Defendants)

115.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were

fully set forth at length herein.

116.    By reason of the foregoing, and by denying Joshua access to adequate

medical care, failing to provide medical treatment, and/or exhibiting deliberate indifference to

Joshua's rights by not acting on information which indicated that unconstitutional acts were

occurring, the Officer and Medical Defendants deprived Joshua of rights, privileges, and

---

[7] *Id.*

24

immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution. The Officer and Medical Defendants acted at all relevant times hereto willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal a conscious indifference to the clear risk of death or serious injury to Joshua that shocks the conscience. As a direct and proximate result of these violations of Joshua's constitutional rights, he suffered the damages hereinbefore alleged.

117.    The Senior Defendants knew that the medical care at Joseph Harp prior to and including the time of Joshua's mistreatment and death was overseen by a doctor who never examined him and had a history of drug abuse and a physician's assistant who had his own past with drug addiction. They failed to adequately supervise the Medical Defendants' care of inmates, and failed to hire qualified, competent, and proficient medical providers to treat inmates like Joshua. Their failure to take measures to curb this neglect constituted acquiescence in the known unlawful behavior of their subordinates and deliberate indifference to the rights and safety of the inmates in their care and custody, including Joshua.  The Senior Defendants' conduct was a substantial factor in the continuation of such abuse and neglect and a proximate cause of the constitutional violations alleged in this complaint and of Joshua's resultant damages, hereinbefore alleged.

118.    Defendants acted under pretense and color of state law and in their individual and official capacities. Said acts by Defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendants acted willfully, knowingly, and with the specific intent to deprive Joshua of his constitutional rights secured by 42 U.S.C. § 1983 and by the Fourth, Eighth, and Fourteenth Amendments to the United States

Constitution.

119.     As a direct and proximate result of the misconduct and abuses of authority

detailed above, plaintiff sustained the damages hereinbefore alleged.

### SECOND CLAIM FOR RELIEF
**Medical Malpractice**
**(Against the Medical Defendants)**

120.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were

fully set forth at length herein.

121.     At all relevant times, the Medical Defendants undertook to provide medical

care to inmates in its custody at Joseph Harp, including Joshua, and they were legally obligated

and had a special duty to do so effectively.

122.     The Medical Defendants were employed, retained and/or contracted with

by DOC to provide medical care to all inmates in the care and custody of the State of Oklahoma

at Joseph Harp, including Joshua.

123.     The Medical Defendants agreed and purported to provide medical care and

services to inmates at Joseph Harp, including Joshua, from May 22, 2018 to May 29, 2018.

124.     The Medical Defendants held themselves out as possessing the proper

degree of learning and skill necessary to render medical care, treatment, and as undertaking

services in accordance with good and accepted medical practice, and that they undertook to use

reasonable care and diligence in the care and treatment of Joseph Harp inmates, including Joshua.

125.     The Medical Defendants were negligent and careless, acted contrary to

sound medical practice, and committed acts of medical malpractice against Joshua. In committing

these acts, the Medical Defendants failed to act in good faith in carrying out the duties of their

employment and abused their power, while still acting under the pretense and color of state law.

26

126.    As a result of the Medical Defendants' medical malpractice, negligence, carelessness, and unskillfulness, Joshua sustained the damages hereinbefore alleged.

### THIRD CLAIM FOR RELIEF
**Intentional Infliction of Emotional Distress**
**(Against the Officer Defendants and the Medical Defendants)**

127.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

128.    The Officer and Medical Defendants engaged in extreme and outrageous conduct intentionally and recklessly causing severe emotional distress to Joshua. The Officer and Medical Defendants abused their power and failed to perform their employment duties in good faith, while still acting under the pretense and color of state law.

129.    By reason of the foregoing, the Officer and Medical Defendants are liable for the intentional infliction of emotional distress.

130.    The Officer and Medical Defendants, their officers, agents, servants, and employees were responsible for the intentional infliction of emotional distress suffered by Joshua.

131.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

### FOURTH CLAIM FOR RELIEF
**Negligent Infliction of Emotional Distress**
**(Against the Officer Defendants and the Medical Defendants)**

132.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

133.    The Officer and Medical Defendants had a duty to protect Joshua from injury.

134.     The Officer and Medical Defendants failed to perform their duty to protect

Joshua from injury. Their repeated disregard of Joshua's medical needs caused and exacerbated

his pain and suffering and his emotional distress. The Officer and Medical Defendants abused

their power and failed to perform their employment duties in good faith, while still acting under

the pretense and color of state law.

135.     By reason of the foregoing, The Officer and Medical Defendants are liable

to plaintiff for the negligent infliction of emotional distress.

136.     The Officer and Medical Defendants, their officers, agents, servants, and

employees were responsible for the negligent infliction of emotional distress suffered by Joshua.

137.     As a direct and proximate result of the misconduct and abuse of authority

detailed above, Plaintiff sustained the damages hereinbefore alleged.

### FIFTH CLAIM FOR RELIEF
**Negligent Hiring/Training/Retention of**
**Employment Services**
**(Against Senior Defendants)**

138.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were

fully set forth at length herein.

139.     The Senior Defendants owed a duty of care to Joshua to prevent the

conduct alleged, because under the same or similar circumstances a reasonable, prudent, and

careful person should have anticipated that injury to Joshua or to those in a like situation would

probably result from the foregoing conduct.

140.     Upon information and belief, all of the Medical Defendants and Officer

Defendants were unfit and incompetent for their positions.

141.     The Senior Defendants knew or should have known through the exercise of

reasonable diligence that the Medical Defendants and Officer Defendants that they employed

were potentially dangerous. The Senior Defendants' negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused Plaintiff's injuries. The Senior Defendants abused their power and failed to perform their employment duties in good faith, while still acting under the pretense and color of state law.

142.    As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

**SIXTH CLAIM FOR RELIEF**
**Wrongful Death**
**(Against All Defendants)**

143.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

144.    By reason of the foregoing, the statutory distributees of Joshua's estate sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Joshua. Defendants are liable for the wrongful death of Joshua.

145.    The acts by Defendants that resulted in Joshua's death represented abuses of power and were not performed in good faith, while Defendants were still acting under the pretense and color of state law.

146.    As a consequence, Plaintiff has suffered damages, including but not limited to burial expenses, mental pain and anguish, pecuniary loss, and grief and loss of companionship, in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### Negligence
### (Against All Defendants)

147.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

148.    At all times relevant to this Complaint, Defendants owed a duty to Joshua to meet the standard of care owed to incarcerated people and/or to ensure that those under their supervision were trained adequately regarding the proper care of such inmates and that adequate policies and procedures regarding the proper care of such inmates were in place. The standard of care required, among other things, proper treatment of Joshua's medical condition, appropriate monitoring of his deteriorating conditions, appropriate testing to determine the case of Joshua's deteriorating condition, and referral of Joshua for evaluation and treatment outside of the prison.

149.    Defendants negligently and/or wantonly breached and violated this standard of care or caused it to be violated, by denying him access to adequate medical care, failing to provide medical treatment, and/or otherwise neglecting his medical needs. Defendants abused their power and failed to perform their duties in good faith.

150.    Defendants' breach of their duty of care was the proximate cause of Joshua's serious and unnecessary injuries, including severe pain and suffering and death.

151.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

    a.   awarding compensatory damages in an amount to be determined at trial;

    b.   awarding punitive damages against the Defendants in an amount to be determined at trial;

    c.   awarding Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

    d.   directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated: July 30, 2019
      Tulsa, Oklahoma

RESPECTFULLY SUBMITTED:


*/s/* Paul DeMuro
Paul DeMuro, OBA No. 17605
FREDERIC DORWART, LAWYERS PLLC
124 East Fourth Street
Tulsa, Oklahoma 74103
(918) 583-9922 - Telephone
(918) 583-8251 – Facsimile
pdemuro@fdlaw.com


Katherine Rosenfeld
*(admitted pro hac vice)*
Alison Frick
*(admitted pro hac vice)*
EMERY CELLI BRINCKERHOFF
& ABADY LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000 - Telephone
(212) 763-5001 – Facsimile

***Attorneys for Plaintiff,***
***Christina Smith***


## CERTIFICATE OF SERVICE

      The undersigned does hereby certify that on the 30th day of July 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the applicable ECF registrants.


/s/ Paul DeMuro