1

Smith v. Allbaugh, et al.
October 30, 2019

1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF OKLAHOMA

3


4
CHRISTINA SMITH,                    )
5  individually and as next         )
   friend of her son, Joshua        )
6  England,                         )
                                    )
7       Plaintiff,                   )
                                    )
8               vs.                 )   Case No. CIV-19-470-G
                                    )
9  JOE ALLBAUGH, et al.,            )
                                    )
10      Defendants.                  )
                                    )
11

12

13

14

15      TRANSCRIPT OF AUDIO-RECORDED PROCEEDING

16      BEFORE THE HONORABLE CHARLES GOODWIN

17             OCTOBER 30, 2019

18          OKLAHOMA CITY, OKLAHOMA

19

20

21

22

23

24
        Proceedings recorded by mechanical stenography, transcript
25  produced by computer.

2

Smith v. Allbaugh, et al.
October 30, 2019

```
 1              A P P E A R A N C E S

 2

 3   For the Plaintiff:

 4        Paul DeMuro
          FREDERIC DORWART, LAWYERS, PLLC
 5        124 East Fourth Street
          Tulsa, Oklahoma 74013
 6
          Henry A. Meyer, III
 7        MULINIX GOERKE & MEYER, PLLC
          210 West Park Avenue
 8        Suite 3030
          Oklahoma City, Oklahoma 73102
 9
          Katherine R. Rosenfeld
10        EMERY CELLI BRINCKERHOFF & ABADY, LLP
          600 Fifth Avenue
11        Tenth Floor
          New York, New York 10020
12        (via telephone)

13

14
     For the Defendants:
15
          Kari Y. Hawkins
16        OKLAHOMA ATTORNEY GENERAL'S OFFICE
          313 Northeast 21st Street
17        Oklahoma City, Oklahoma 73105

18

19

20

21

22

23

24

25
```

3

Smith v. Allbaugh, et al.
October 30, 2019

```
1         (Proceedings held on October 30, 2019.)
2              THE COURT:  Good morning.  This is Judge Goodwin.
3    We're here for the status and scheduling conference in
4    Christina Smith versus Joe Allbaugh, et al., Case Number
5    19-CV-470.
6         I'll have counsel make their appearances.
7              MR. DeMURO:  Good morning, Your Honor.
8         May it please the Court:  Paul DeMuro of Frederic Dorwart
9    Lawyers in Tulsa and Hank Meyer of Oklahoma City here
10   personally and Ms. Katie Rosenfeld from New York is on the
11   phone.
12        We appreciate the Court's courtesy.  Ms. Rosenfeld wanted
13   to be here very much but suffered an injury while she was on
14   her way to the airport in New York and was unable to make it.
15   So we appreciate Your Honor's flexibility in allowing her to
16   participate by phone.
17             THE COURT:  Absolutely.
18             MS. HAWKINS:  Kari Hawkins for the defendants, named
19   defendants.
20             THE COURT:  All right.  Thank you, Ms. Hawkins.
21        Okay.  We've got a couple of issues on the case.  We've
22   got a pending motion to dismiss.  I'm expecting to have an
23   order on that shortly.
24        We've got, at the same time, a motion to begin discovery
25   in advance of that ruling.
```

4

Smith v. Allbaugh, et al.
October 30, 2019

1    Why don't I start with the plaintiff, and I'll have you

2  tell me a little bit about the case and what's going on, from

3  your perspective, and then anything else that you want to tell

4  me on the motion for immediate discovery.

5         MR. DeMURO:  Yes, Your Honor.

6    May it please the Court:  This case concerns the death of

7  a 21-year-old young man in Joseph Harp Correctional Center in

8  May of 2018.

9    He had been sentenced to less than a year in prison for a

10 fourth-degree arson felony that he committed when he was 20

11 years old.  A few weeks before his death -- he died of acute

12 appendicitis.

13   Now, our claim, Your Honor, is -- we've asserted several

14 claims.  The gravamen of the petition is a 42 U.S.C., 1983

15 claim.

16   Our contention is that the defendants were deliberately

17 indifferent to an obvious and objective serious medical

18 condition.

19   Specifically, during the weeks preceding his death,

20 Joshua England was exhibiting the classic symptoms of

21 appendicitis.  He sought medical care through the D.O.C.'s

22 procedures, Joseph Harp's procedures, on five separate

23 occasions within the last week or so of his death.

24   On each occasion he was complaining of the classic

25 symptoms of appendicitis; elevated heart rate, weight loss,

5

Smith v. Allbaugh, et al.
October 30, 2019

1 dizziness, severe abdominal pain, confusion.  The symptoms

2 progressed during the week.  He was witnessed, by various

3 people, falling down, being incoherent.

4      The last time that he went of the series of five visits

5 within that seven or eight days, at that time the staff had

6 not provided any meaningful medical care, no abdominal exam.

7 He didn't see a physician.  He was given things like

8 Pepto-Bismol and sent back to his cell.

9      The last time that he went down there, the day of his

10 death, he was exhibiting symptoms of toxic shock; confused,

11 couldn't walk, had to be wheel-chaired down there.

12      By some manner or mechanism, the medical staff at D.O.C.

13 purported to have him sign a waiver of treatment form that

14 said something to the effect of "you're suffering from a

15 condition that may cause your death but you hereby waive

16 treatment."

17      Of course, that was after he sought treatment five times

18 in seven or eight days.  They took him back -- wheeled him

19 back to his cell where he died on the floor alone in a pool of

20 green bile, again classic symptoms of appendicitis.  The

21 autopsy report confirmed that he died of simple appendicitis.

22      We -- in investigating the case, Your Honor,

23 Ms. Rosenfeld and I went to the prison before we filed suit.

24 We're very careful about the suit -- the type of cases that we

25 file.

6

Smith v. Allbaugh, et al.
October 30, 2019

1       We interviewed five different inmates; my recollection,
2  five.  Several of the inmates talked about the conditions that
3  I just described, witnessing Joshua's final moments and the
4  various instances where he sought medical care.
5       Several of the inmates also said they witnessed a D.O.C.
6  staff member, on Joshua's final day, following him back to his
7  cell from the medical unit with a video camera, purporting to
8  videotape his alleged refusal of medical care, and that
9  that -- there was a videotape -- video camera following him
10 back.  Several witnesses have either told us they saw it or
11 they heard about it.
12      This kind of segues into our discovery motion.  So hold
13 that thought for just a second.
14      Based on those claims, Your Honor, we've -- based on
15 those allegations, we have sought 1983 claims.  I'll back up a
16 minute.
17      In our investigation of this case, we also did some
18 background work on the medical professionals who provided
19 care, Defendant Balogh and the medical -- Physician's
20 Assistant Miles.
21      Both of them have very checkered pasts.  Both suspended
22 for their own drug-alcohol use, fraudulent conduct as medical
23 professionals, put on probation or suspension, and then landed
24 at Joseph Harp.  Those were the people responsible for his
25 care.

7

Smith v. Allbaugh, et al.
October 30, 2019

1  So we have asserted a 1983 claim based on deliberate

2  indifference to an obvious serious medical risk.  We've

3  asserted a group of state law claims, Your Honor, including

4  medical malpractice against the medical folks, intentional

5  infliction of emotional distress, and wrongful death.  There

6  are some other state law claims, but that's the essential

7  categories.

8  Now, we move forward to the motion under this Court's

9  local Rule 26.2(c), and the basis is fairly simple.

10  The only grounds that the defendants have to seek a stay

11  of discovery separate from the local rule is their assertion

12  of qualified immunity.

13  Our position is that this Court retains the discretion,

14  in a qualified immunity context, to order discovery, limited

15  discovery, based on several considerations, including the

16  facial merits of the motion and the relative burdens to the

17  parties.

18  The basis of the defendants' motion, Your Honor, in

19  qualified immunity is that there was no -- it has to be

20  because this is qualified immunity.  There was no clearly

21  established Constitutional right for a prisoner to be free of

22  deliberate indifference of a serious medical condition.

23  That's an untenable argument on its face.  There's a line

24  of cases dating back to *Estell v. Gamble*, U.S. Supreme Court,

25  1976.  Several cases in the Tenth Circuit, *Mata v. Saiz* and

1    the *Robinson* case, a 2014 case, in our brief, which talk about

2    these specific types of allegations.

3        The Tenth Circuit has said clearly years ago there can

4    be, quote, little doubt that the right to be -- to medical

5    care for a serious medical condition and deliberate

6    indifference to a serious and obvious medical condition is a

7    clearly established Constitutional right, including, in the

8    *Robinson* case, severe abdominal pain.

9        So we've got a situation that is right on point, in terms

10   of establishing a clear Constitutional right.

11       The defendants have asserted the qualified immunity

12   defense at this early stage.  We think that that's a highly

13   untenable position, to put it politely, because it's such an

14   obviously clearly established right.

15       So, therefore, we're seeking limited discovery.  The

16   discovery we're seeking, Your Honor, is stuff -- is material

17   that's in their possession and would not cause any burden, any

18   substantial burden.

19       I'll give you two examples.

20       We just want to know, where's this videotape?  We're

21   concerned about spoliation.  We've talked to the D.O.C.

22   counsel before we filed suit, put them on notice, hey, there's

23   a videotape there, please preserve it.  We get no verification

24   back that a videotape exists.

25       When we file the lawsuit, we engage in discussions again.

1  We'd like to know whether there's a videotape; if there is,

2  please preserve it, please produce it.

3      We've been rebuked of any discussions around it.  We're

4  not getting a clear answer.

5      And in their response to our motion for discovery, they

6  are coy in their phrasings about whether there's a videotape

7  or not.

8      We just want to know, is there -- was a videotape made?

9  If so, where is it?  Who made it?  And we want it.  It's just

10 that simple.  So that's the type of discovery we want.

11     We also just want the investigative reports or witness

12 statements that go along with this.  We also want his medical

13 files.

14     And some gamesmanship, we think, is being played here.

15 When we asked for the videotape, they said, well, the

16 videotape is not in his medical files.  We really don't care

17 where the videotape is, we just want it.

18     So that's why we're pressing early discovery, Your Honor.

19 We think that the motion -- the assertion of qualified

20 immunity is not tenable.  You can evaluate that, I think, on

21 its face, Your Honor.

22     And the burden of producing this material is not great,

23 and it will advance early settlement discussions and early

24 evaluation of the case.

25     If the folks that we interviewed are wrong and there was

1   no videotape, we need to know that.

2        We need to see his medical records, his complete medical

3   records.  There are statements in the joint status report of

4   his medical records that we don't have.

5        All of that stuff will advance the case, advance early

6   settlement discussions, and take care of issues regarding

7   potential spoliation of evidence.

8              THE COURT:  Okay.

9              MR. DeMURO:  One further note, I think under the

10  joint status report, Your Honor, the plan calls for an

11  agreed -- preliminary disclosures under Rule 26 on November

12  1st.

13       So ordering them to do this additional discovery, which

14  is just, I think, four or five categories of documents,

15  shouldn't impose any greater burden than they're already doing

16  because I would suspect that most of the stuff we've requested

17  should be produced on November 1st.

18       But given the history, in terms of not being able to get

19  any clear answer on the videotape, we'd like Your Honor to

20  permit us to submit some document requests.

21             THE COURT:  Okay.

22             MR. DeMURO:  Thank you, Your Honor.

23             THE COURT:  I understand.

24       All right.  I turn then to the defendant and hear, in

25  general, about the case and your perspective on what this is

1   all about and then to address the motion for additional

2   discovery -- or early discovery, I should say.

3           MS. HAWKINS:  Thank you, Your Honor.

4       Our position is, with regard to the deliberate

5   indifference claim, we feel like they've basically pled a

6   negligence claim, but we don't believe that negligence rises

7   to the level of deliberate indifference.  It's a totally

8   different standard.

9       We feel like that's why the defendants are entitled to

10  qualified immunity.  I think the record will show that at all

11  times he was receiving medical care.

12      I mean, there's probably an issue with, was there a

13  misdiagnosis?  But I think that's different than being

14  deliberately indifferent or ignoring his medical needs.

15      With respects to defendants Carl Bear and Joe Allbaugh,

16  they have been sued for their failure to adequately supervise

17  the medical staff.

18      They do not supervise medical staff.  That's a totally

19  different chain of command.  Ultimately, of course, the

20  director sits at the top of the state agency, but medical

21  staff reports to the chief medical officer.  They don't report

22  to the warden of the prison or directly to the director of the

23  Department of Corrections.

24      With regard to the tort claims, we feel like (audio

25  garbled) -- you know, placing them outside the scope of

1  employment.  We don't agree that they were acting outside the

2  scope of employment or in bad faith at any time.

3         Just the record supports the fact that they were seeing

4  the plaintiff when he requested medical care at all times.

5         On the request for documents, I want to start out by

6  saying this:  We've never said that the plaintiffs can't

7  subpoena those records from the Department of Corrections.

8  That's the usual course of action in these cases when you sue

9  individuals with a state agency.

10        They don't -- this is set forth in policy.  Employees

11 don't have access or the right to possess investigations or

12 surveillance videos.  They can't walk into a security office

13 and say, I want a copy of a surveillance video.

14        By no means are we saying that the plaintiffs can't

15 subpoena those records from the Department of Corrections.

16        And in the response to the Open Records request, Davidson

17 Cincotta, the former general counsel, specifically said those

18 are records that have to be subpoenaed.

19        I disagree wholeheartedly that the defendants possess

20 custody and control over agency investigations and things like

21 surveillance video.  I don't even think they have custody or

22 control over his medical records at this point.  Those are

23 closed files.

24             THE COURT:  Are the defendants sued in their

25 individual or official capacities or both?

1    MS. HAWKINS:  Individual capacities only.

2    THE COURT:  Okay.

3    MS. HAWKINS:  Individual capacities only.

4    Again, I have no objection to any subpoenas being issued

5 to the State, Oklahoma Department of Corrections.  They are

6 the ones who have these records.

7    I want to get to the issue of the video.  I thought it

8 was important, in my joint status report, to go into a little

9 bit more detail about the timeline of what happened because I

10 do think there's some confusion about the video and when it

11 was taken and by whom.

12    Joshua England signed the waiver of medical care at

13 approximately 9:15.  Everything is very well documented in the

14 agency.  I want to ensure the Court that nothing has been

15 destroyed, there's been no spoliation of evidence.

16    As far as I know, the Department of Corrections still has

17 all of those records that they would produce in response to a

18 subpoena and hopefully under a protective order with the

19 Court.

20    But the plaintiffs have specifically alleged that the

21 defendants took a handheld video camera into Joshua England's

22 cell and recorded him signing a waiver of treatment.  That is

23 not true.

24    The only defendant who walked into his cell with the

25 waiver of treatment, along with some nonparties or parties who

14

Smith v. Allbaugh, et al.
October 30, 2019

1   have not been named yet, were officers in the prison, and no

2   one had a video camera.  No one recorded him with a handheld

3   video signing the waiver of treatment.  That's false.

4       When he was found unresponsive, he wasn't in his cell, as

5   has been alleged.  He was on what we call the run or in the

6   day room.  He had sat down outside of his cell and then

7   slumped over.

8       Prison officials responded.  Pursuant to policy at that

9   time, they're required to document that with handheld video.

10  No defendants were there.  No defendants recorded it.  That

11  video does exist.

12      If there's any, you know, doubt about what was or wasn't

13  recorded by the defendants at any time, since it's a prison,

14  there's also surveillance video that would show the response

15  and who had a handheld video camera and at what time they have

16  it.

17      All those records have been preserved by the Department

18  of Corrections.  Again, they can be subpoenaed at any time.

19      The defendants don't have custody or control over those

20  records, and we have no problem with them subpoenaing those

21  records.

22      I do have a problem with the allegation that the

23  defendants walked in his cell and recorded him dying as he

24  signed a waiver of treatment.  That's just not true.  It's

25  been repeatedly alleged.

1    That's -- you know, we also feel like, pursuant to the

2  Court rule and qualified immunity, defendants are not

3  required -- the individual defendants are not required to

4  participate in discovery at this point until the Court rules

5  on the motion, but plaintiffs are free to subpoena whatever

6  they want to from the Department of Corrections.  I think

7  David Cincotta made that clear in his response to the Open

8  Records request.

9    Up until now, they have repeatedly said defendants have

10  denied records.  No records have been requested from the

11  defendants.  They filed an Open Records request to the agency,

12  not to the defendants.  So the defendants have not denied

13  anything.

14    We've only objected to commencement of discovery until

15  the Court rules on the motion to dismiss.

16          THE COURT:  All right.  I understand.

17          MR. DeMURO:  May I briefly respond, Your Honor?

18          THE COURT:  Yes.

19          MR. DeMURO:  So this issue of individual capacity

20  shielding them from discovery obligations is a false red

21  herring issue.

22    In 1983 cases, because of the Eleventh Amendment, the

23  plaintiff has to sue the offending defendants in their

24  individual capacity, state actors in their individual

25  capacity.

1    What the Attorney General is essentially arguing is that

2  in no 1983 case does the warden of the prison have access to

3  records.  We've sued the warden.

4    That's a fallacious opinion.  They have cited no

5  authority for it.

6    The distinction of being sued in your individual capacity

7  doesn't translate over to the Federal Rules of Civil Procedure

8  and say it negates your custody and control of documents.

9    If that were the case, a 1983 plaintiff, such as

10  Mr. England, would never be able to receive documents directly

11  from the defendants.

12    That's not the case.  There is no law to support that.

13  We think this is a dodge.  And this is the first time -- and

14  I'll sit down with this.

15    We've been on this road for months, pre-investigation,

16  engaging with the D.O.C., Open Records requests, filing a

17  lawsuit, motions to dismiss, amendment, and this is the first

18  time that we've heard a description of the video.

19    I'm glad we've heard it, but it shouldn't take that long

20  to get to just what the core facts are and what the core

21  evidence is.  That's why we've asked for early discovery.

22    THE COURT:  I understand.  Okay.

23    Here's what we're going to do.  I'm going to defer ruling

24  on the motion for early discovery really only because I expect

25  to have a ruling on the motion to dismiss within several days.

1    And so if, for some reason, it takes me longer than I

2    expected and we get locked up on an issue, then I'll get you a

3    ruling on the motion for early discovery so that we'll have an

4    answer on that, one way or the other, within a couple of days,

5    but I do expect that in very short order we'll have a ruling

6    on that motion.  Then, one way or the other, that will resolve

7    the question of how you proceed.

8    Let's talk, in general, about -- assuming that that all

9    happens as I expect, you've requested nine months for

10   discovery.  That seems reasonable to me.  That would result in

11   an October 2020 trial docket under the Court's standard

12   schedule.

13   Is there any heartburn about that trial setting?

14           MR. DeMURO:  No, Your Honor.  I think that's

15   appropriate.

16           THE COURT:  All right.  From the defendant?

17           MS. HAWKINS:  No, Your Honor.

18           THE COURT:  Okay.  Any need for any specialized

19   discovery deadlines?

20           MR. DeMURO:  Your Honor, I don't think so.

21   I do think there is a need in Your Honor's scheduling

22   order to put another milestone for amendment to the pleadings.

23   In these types of cases, it's not infrequent, when we

24   find out who did what, to amend to add additional folks.

25   Given that your scheduling conference summary sheet of

1  scheduling orders for nine months out puts the final --

2  plaintiff's final witness lists, you know, in the June or May

3  frame, I suggest there be an amendment deadline sometime in

4  the first quarter of 2020.  Sometime in February, I think,

5  would be appropriate.

6       That would give us a chance to get some discovery back

7  and see if we need to add additional parties.

8            THE COURT:  All right.  I'll take a look at that.

9       We have a typical deadline that we put in for amendment

10 of pleadings.  I think it's earlier than that.  So 14 days is

11 what we typically do.

12           MR. DeMURO:  And I appreciate that.  I don't think

13 that's sufficient in this case because, as we've heard, you

14 know, the D.O.C. is kind of like a black box.  Until plaintiff

15 can pierce it and get the discovery and know who reports to

16 whom, we don't know all the defendants.

17      Some of them are John Doe defendants and Jane Doe

18 defendants.  So we'll at least need enough time to conduct an

19 initial round of discovery and then sort it out.

20      So 60 days is perhaps more reasonable, 60 days from today

21 or 90 days from today.  Since we've got a trial that's

22 relatively far out, I think that's not going to prejudice

23 anyone.

24           THE COURT:  Of course, the deadline is just a

25 deadline to amend as a matter of right.  You can always file a

 1   motion for an amendment if there's a specific need.

 2        Let me ask the defendant, is there any objection to a

 3   60-day amendment deadline?

 4             MS. HAWKINS:  No, Your Honor.

 5             THE COURT:  All right.  Then I'll order that.

 6        As far as ADR, I think you-all heard me previously say

 7   that my policy is that by the time we get to docket call in

 8   the case I want you to go through some formal process.

 9        I don't care whether it's a judicial settlement

10   conference with one of our magistrate judges or a private

11   mediation.  There's good folks either way.  There's good

12   reasons to go one way or the other.

13        So I'll leave that up to you, but I do want you, if

14   you're not able to work it out on your own, to go through some

15   formal process by the time we get to the trial setting.

16        That said, though, I always ask whether there is a need

17   for me to nudge you along towards early settlement

18   discussions.

19        Would this be a case where that would be appropriate?

20             MR. DeMURO:  Your Honor, in our joint status report,

21   we indicated the chances for settlement were poor.

22        From the plaintiff's perspective, I tell all my clients

23   that a good settlement beats a good trial any day of the week,

24   and we should always be -- have our minds set to that.

25        We would welcome any assistance by the Court.  We think

1  we have a strong case.  As long as we have the documents

2  necessary to evaluate our positions, I don't know that we need

3  any particular assistance.  We might later.

4          THE COURT:  Okay.

5          MR. DeMURO:  But I'm always --

6          THE COURT:  Do you think you need some time to mull

7  around and get your documents and then you'll see where you

8  are?

9          MR. DeMURO:  Correct, Your Honor.

10         THE COURT:  All right.  What I'll say in general is

11 that I think people are more sophisticated than they used to

12 be.

13     No one views it as a weakness to ask for the other side

14 to set up a settlement conference or engage in settlement

15 discussions.  But every now and then, there is some

16 reluctance, and I can play a role at least in nudging you

17 along.

18     So if there is something that you collectively or

19 individually decide that it would be useful for me to do, as

20 far as helping you get to a good discussion of whether you

21 want to settle, then just let us know by filing a motion or,

22 if you need to, just call Mr. Buckle, my courtroom deputy, and

23 we'll take it up at that time.

24     With that, is there anything that would be beneficial to

25 talk about while we're all together?

1        MR. DeMURO:  Not from the plaintiff, Your Honor.

2   Thank you for your time.

3        MS. HAWKINS:  No, Your Honor.  Thank you.

4        THE COURT:  All right.  Thanks to all of you.

5      As I say, we'll get orders out on those pending motions

6   soon.  Everyone here for that case is excused.

7        MR. DeMURO:  Thank you, Your Honor.

8        MR. MEYER:  Thank you, Your Honor.

9        MS. HAWKINS:  Thank you, Your Honor.

10       MR. DeMURO:  May we be excused?

11       THE COURT:  Yes.

12       MS. ROSENFELD:  Thank you, Your Honor.

13       THE COURT:  Thank you.

14     (End of audio recording.)

15

16

17

18

19

20

21

22

23

24

25

1              **REPORTER'S CERTIFICATE**

2

3          I, SHERRI GRUBBS, Federal Official Court Reporter in

4    and for the United States District Court for the Western

5    District of Oklahoma, do hereby certify that pursuant to

6    Section 753, Title 28, United States Code that the foregoing

7    is a true and correct transcript of audio-recorded proceedings

8    transcribed to the best of my ability from an audio recording.

9    held in the above-entitled matter and that the transcript page

10   format is in conformance with the regulations of the Judicial

11   Conference of the United States.

12

13         Dated this 24th day of January, 2020.

14

15                    /S/ SHERRI GRUBBS_____

16                    SHERRI GRUBBS, RPR, RMR, RDR, CRR
                      State of Oklahoma CSR Number 1232
17                    Federal Official Court Reporter

18

19

20

21

22

23

24

25